## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JAMES DAVID RHODES** | : | Civil Case No._____ |
| **c/o LoRusso Law Firm** | : | |
| **1827 Powers Ferry Road SE** | : | Judge: |
| **Building 8, Suite 200** | : | |
| **Atlanta, Georgia 30339** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JURY DEMAND** |
| | : | |
| **CITY OF ATLANTA, GEORGIA** | : | |
| **55 Trinity Avenue SW, Suite 2900** | : | |
| **Atlanta, Georgia 30303** | : | |
| | : | |
| **CITY OF ATLANTA FIRE CHIEF** | : | |
| **JOEL BAKER,** *individually and in his* | : | |
| *official capacity as an employee of the* | : | |
| *City of Atlanta* | : | |
| **226 Peachtree Street SW** | : | |
| **Atlanta, Georgia 30303** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT FOR DAMAGES

COMES NOW JAMES DAVID RHODES ("Plaintiff") and files this

Complaint for Damages against the City of Atlanta, Georgia (City of Atlanta) and

City of Atlanta Fire Chief Joel Baker (Baker), in his official and individual capacities ("Defendants") showing this Court as follows:

## PRELIMINARY STATEMENT

1.    This civil rights case challenges the termination, demotion and salary reduction of Plaintiff David Rhodes, formerly a Battalion Chief employed by the City of Atlanta assigned to the Fire Rescue Department.  Plaintiff was unlawfully subject to adverse employment actions without due process based solely upon, and in retaliation for, his exercise of his right to free speech guaranteed by the First Amendment of the United States Constitution and his rights under the Georgia Constitution following the publication of an article he authored entitled, "T-Shirt Management" in a nationally-recognized journal dedicated to the concerns, needs, and training of professional firefighters. The article, which contained a great deal of satire and humor, addressed matters of public concern.

## JURISDICTION

2.    Jurisdiction over claims arising from Defendants' violation of the constitutional rights of Plaintiff Rhodes is conferred upon this Court by 28 U.S.C. §§ 1331. 1343 (3) and (4).

3.      Jurisdiction over state law claims is conferred upon this Court by 28 U.S.C. § 1367.

4.      Venue is proper in this Division.

## PARTIES

5.      Plaintiff Rhodes was at all times relevant to this action a resident of Oconee County, Georgia.

6.      Defendant City of Atlanta is a unit of local government organized under the laws of the State of Georgia.  Defendant City of Atlanta is a "person" under 42 U.S.C. § 1983 and at all times relevant to his case acted under the color of law.

7.      Defendant Joel Baker was at all times relevant to this action an employee of the City of Atlanta, Georgia, working as a City of Atlanta Fire Chief. Defendant Baker is a "person" under 42 U.S.C. § 1983 and as all times relevant to this case acted under the color of law.  He is sued in both his individual and official capacities.

## FACTS

8.      Plaintiff Rhodes has been employed by the City of Atlanta within the City of Atlanta Fire Rescue Division since January 16, 1992.

3

9.     On October 7, 2004, Plaintiff Rhodes was promoted to the position of Battalion Chief.  He served in this position without incident until his termination then subsequent demotion to the position of Fire Captain which is the subject of this lawsuit.

10.     Upon his termination on August 15, 2016, Defendant Baker told Plaintiff the termination was not for cause and he was being terminated because "his services were no longer needed." When pressed for a reason, Defendant Baker stated, "No reason."

11.     On August 15, 2016, Plaintiff Rhodes was the longest serving Battalion Chief in the City of Atlanta. He had provided twenty-four years of service to the City of Atlanta and thirty-one years of total service as a firefighter. He sits on the boards of Underwriters Laboratories Fire Safety Research Institute, Fire Engineering Magazine specifically on the Editorial Advisory Board, Fire Apparatus and Equipment Magazine specifically on the Fire Department Instructors Conference, and formerly sat on the Scott Health Safety User Advisory Board.

12.     On June 1, 2016, an article of great public interest addressing safety, budgeting, and efficiency concerns within the firefighting profession authored by

4

Plaintiff Rhodes was republished in the publication *Fire Rescue Magazine.* The article first appeared on the Fire Engineering website in 2014 and was republished in 2015. Parts of this article appeared in other publications in various forms prior to June 1, 2016.

13.    Plaintiff Rhodes works a side job as a professional journalist writing articles for trade and other professional journals and websites such as fireengineering.com and firefighternation.com related to the profession of firefighting. Further, fireengineering.com encourages board members to blog and post articles of interest to the firefighting profession. Since 1999, Plaintiff has authored more than eighty-five articles and created at least thirteen training videos many of which have been distributed worldwide.

14.    Plaintiff Rhodes' side job also includes consulting, training, logistical management, promotional assessments for private industries, government agencies, and the military.

15.    For the time period at issue in this Complaint, Plaintiff Rhodes received approval for his outside employment from the Defendant City of Atlanta Georgia through Defendant Baker as the final policy maker for Defendant City of

Atlanta Georgia. None of his written requests submitted for this outside employment were rejected, limited, or questioned.

16.   Defendant City of Atlanta requires every firefighter employee to fill out a document entitled, "Request for Permission to Perform Outside Employment" to list any employment outside of their City employment.

17.   For the past several years, Defendant City of Atlanta has further required every firefighter employee to fill out a document entitled, "Request for Permission to Perform Outside Employment" to list any employment outside of their city employment or to affirmatively state that they do not engage in employment outside of their city employment.

18.   Plaintiff Rhodes has filled out and properly submitted the form entitled, "Request for Permission to Perform Outside Employment" or a similar form, for more than twenty years outlining his request to perform essentially the same type of outside employment. Never once was Plaintiff Rhodes' request for outside employment denied, limited, or questioned. Plaintiff also completed all required ethics training.

19.   *Fire Rescue* Magazine is a "monthly publication presenting vital solution-oriented news and skills for firefighters and fire officers who rely on

6

cutting-edge information they can use on the job. *Fire Rescue* magazine, devoted

to the interests of firefighters worldwide", is published by PennWell Publishing.

The magazine "is the top source of information and resources for the fire-rescue

community, as the leading online destination for fire personnel."

20.     *Fire Rescue Magazine* reaches fire chiefs, company officers and

firefighters with 'devoted to the interests of firefighters worldwide' content that

gives fire-rescue professionals the education they want and need. Always on duty,

*Fire Rescue* provides the pivotal component to all media strategies in the fire-

rescue market."

21.     The title of the article, entitled, *T-Shirt Management: The long-

brewing issue of department T-shirts and the disagreements they bring to the

firehouse* ("Article") presented a satirical and humorous examination of the time

and resources spent by supervisors, managers, and command staff disciplining and

creating policy about T-shirts containing logos depicting a particular fire station,

division, or unit within a fire department (T-shirts) that are traditionally worn by

firefighters around the United States. The T-shirts are typically visible when the

firefighters are outside the view of the public.  At all other times, the T-shirts are

typically covered by "turnout gear" which is the protective clothing worn by

firefighters on the scene of an incident or "top shirts" which are akin to a dress or uniform shirt. The T-shirts are worn by fire department personnel throughout the United States and are often a great source and expression of pride and camaraderie. City of Atlanta policy allows firefighters to develop, design, and wear such T-shirts.

22.     The Article raised issues of public concern by pointing out the amount of time, resources, and effort spent by supervisors, managers, and command staff members of fire departments drafting policies that govern the wearing of T-shirts and disciplining firefighters for wearing T-shirts at inappropriate times and in view of the public when that time and effort should be devoted to more appropriate activities including, but not limited to:

    a.     managing budgets to be good stewards of public funds;

    b.     allocating resources of personnel and equipment;

    c.     planning for disasters;

    d.     ensuring firefighters are paid according to federal law;

    e.     training firefighters to fight fires and perform C.P.R.;

f.      addressing the safety of firefighters while performing highly

dangerous functions such as crawling through a fire with outdated

breathing apparatus; and

g.      "delivering a service to the citizens".

23.     An example of the inefficiency and misdirection of resources that raise a public concern is a quote from the Article that reads as follows: ". . . please keep in mind that no firefighter has ever been injured or killed as a result of having the "wrong" T-shirt on. So what are you spending your time managing?"

24.     The Article raised issues of public concern by pointing out the amount of funds, time, and resources spent by fire departments redesigning T-shirts and patches whenever a new chief is named when those resources could and should be devoted to more serious obligations that impact public safety and the safety of fire fighters. Satirical and humorous articles and videos regarding this same issue are widespread as this is an issue of relevance and importance to firefighters and communities throughout the United States.

25.     The Article was satirical and humorous as evidenced by the following content:

9

a.  "In the midst of all this are those incident responses that often involve life-and-death decisions that seem to always get in the way of our management duties! (Oh wait, isn't that what we are really there for? Delivering a service to the citizens?)"

b.  "At headquarters, the chiefs are busy attending many meetings; trying to plan projected budget shortfalls; fielding special requests from elected officials; and investigating and dealing with the aftermath of some of our special employees who could keep their jobs for 30 years if they would just  get to work on time, stop driving drunk, or stop posting stupid pictures on social media and just wear the right damn T-shirt! (What?)"

c.  "We never have the time to do things right, but we always have the time to do them over."

d.  "When a department's crisis is at its height, we are reminded of our duty to ensure that everyone is wearing the correct T-shirt. What?!?"

e.  "It is easy to catch the ill-reputed wrong T-shirt wearer and scorn him with shame..."

f.  "Oh how we love to dwell on the T-shirts that have changed designs three  times in five years! New chief – new T-shirt, new patch, new name, new speak about changing the culture, and so forth And then, like the most predicable line in a song or a movie, someone at some level brings up illegal T-shirts."

g.  The Article points out that while other uniform parts and gear have evolved over the years to increase the safety of firefighters, the T-shirt has remained part of the uniform.

h.  "So why has this little management toxin (referring to T-shirts) such a popular item with those who do the work? It's actually pretty simply, it works, it's comfortable, it's easily changed, and it serves as a billboard of pride for a department station or special unit. Another great advantage is that it's cheap! This should be a management no brainer…hmmm, the guys like  them, they are very functional, and they are very cheap. (Ding, ding, ding. Winner, winner, chicken dinner!)"

i.  "If your department is dealing with obsessed T-shirt managers, please know that the troops are overwhelmingly amazed that this would even

take up two seconds of thought within our management circles. They

question our ability to understand real issues."

j.      "I'm going to try to put this long-time issue to rest by offering a

boilerplate standard operating procedure (SOP) (just fill in the

blank.)"

k.      The Article contained a proposed policy entitled, "T-Shirt Standard

Operating Procedure" containing a blank space for the name of the

department.

l.      The Article proposed a mock policy entitled, "T-Shirt Standard

Operating    Procedure" that contained the following satirical

provisions with a mock punishment as firefighters universally would

rather respond to calls for service than sit behind a desk:

1.      "Anyone assigned to a position that responds to incidents and

does work may wear a T-shirt while doing so."

2.      "Anyone who violates this policy will be assigned to

headquarters for a period of 90 days for each violation and be

required to wear a long-sleeved dress shirt, a tie, and dress

pants with dress shoes and will not be allowed to respond to incidents."

m.      "I think this is a fair compromise to this extremely complex issue that has plagued our fire service for years. Yet in the meantime, please keep in mind that no firefighter has ever been injured or killed as a result of having the "wrong" T-shirt on. So what are you spending your time managing?"

26.      The Article was not directed or aimed at Defendant Baker, did not mention or reference Defendant Baker by name, title, or employer, and did not openly criticize any particular rank. The article was critical of all ranks at all fire departments that waste time, resources, and efforts on T-shirt policies and associated discipline.

27.      The Article was not an employee complaint or personal grievance as it did not mention or complain about any City of Atlanta Fire Rescue or City of Atlanta policy, employee, elected official, or agent.

28. Plaintiff, through the Article, did not speak as a City of Atlanta employee.

29.    Plaintiff authored the Article on his own time and the drafting, editing, and publishing of the Article was not part of his job duties or even related to his job duties.

30.    Plaintiff did not draft, edit, or publish the Article at the direction of anyone employed by Defendant City of Atlanta.

31.    The Article did not mention Plaintiff's employment, did not identify Plaintiff as an employee of Defendant City of Atlanta, nor did it refer to the City of Atlanta either directly or indirectly in any manner.

32.    The Article did not cause any disruption to the harmony of the workplace.

33.    The Article did not have a negative effect on the efficiency of the public services rendered by the City of Atlanta to the citizens and business owners in the City of Atlanta.

34.    Defendant Baker was offended by the Article as evidenced by the fact that he voiced his displeasure about the Article to employees of the City of Atlanta assigned to the Fire Rescue Department and ordered an investigation into the Article and Plaintiff's role in drafting, editing, and publishing the Article.

35.     Defendant Baker further voiced his displeasure with the Article by writing the words "*Public Criticism" and "*Conduct" or having those words written at his direction on a copy of the Article.

36.     Defendant Baker ordered Deputy Chief of Operations Rod Smith to conduct an investigation into the Article. Deputy Chief Rod Smith delegated this investigation to Assistant Fire Chief Woodworth. Assistant Fire Chief Woodworth was on vacation and advised Deputy Chief Smith he would investigate upon his return.

37.     Assistant Fire Chief Woodworth did not conduct any investigation. Neither did Deputy Chief Smith.

38.     Even though no investigation was conducted by Assistant Fire Chief Woodworth, Defendant Baker made the decision to terminate Plaintiff.

39.     On August 15, 2016, Defendant Baker, assisted by City of Atlanta Employee Stephanie Smith, terminated Plaintiff Rhodes advising him that "his services were no longer needed" and "Georgia is a right to work state" or similar words.

40.     This termination was in direct retaliation for Plaintiff writing and allowing the Article to be published. Plaintiff's termination was reported in the media by numerous media outlets in numerous states.

41.     The Article was a substantial motivating factor in the termination of the Plaintiff.

42.     There were no alternate grounds for the termination of the Plaintiff.

43.     Neither on August 15, 2016 nor any time thereafter did Defendant Baker express any grounds for the termination of the Plaintiff.

44.     On August 15, 2016, it appeared that Defendant Baker appeared to be basing Plaintiff Rhodes' termination on the fact that Georgia is an at will employment state.

45.     Although Georgia is an at will employment state, Plaintiff Rhodes' employment is governed by the rules, regulations, ordinances, and policies of the Defendant City of Atlanta.

46.     Based upon the rules, regulations, ordinances, and policies of the Defendant City of Atlanta, more specifically, but not limited to City of Atlanta Ordinance Section 114-84 (d), Plaintiff Rhodes, was and is a "Classified Employee" with the full rights and protections arising from said classification.

16

47.    City of Atlanta Ordinance Section 114-381 provides that a classified employee may only be discharged for "just cause" defined as "delinquency, misconduct, inefficiency in performance or inability to perform assigned duties, insubordination or willful violation of this Code or the provisions of any city ordinance or of any rule or regulation of the city and any department thereof."

48.    City of Atlanta Ordinance Section 78-28 sets out that as a Battalion Chief, Plaintiff Rhodes could not be terminated without cause, but could only be demoted to his last "Classified" position, in this case the rank of Fire Captain.

49.    Although City of Atlanta Ordinance Section 78-28 sets out that a Battalion Chief "may be removed or transferred at the pleasure of the fire chief" it does not allow the fire chief to terminate a Battalion Chief without cause.

50.    Although City of Atlanta Ordinance Section 78-28 sets out that a Battalion Chief "may be removed or transferred at the pleasure of the fire chief" it does not allow the fire chief to reduce the salary of a Battalion Chief such as Plaintiff Rhodes even if he is lawfully demoted to his last protected "Classified" rank of Fire Captain.

51.    Although City of Atlanta Ordinance Section 78-28 sets out that a Battalion Chief "may be removed or transferred at the pleasure of the fire chief" it

does not allow the fire chief to demote a Battalion Chief such as Plaintiff Rhodes for an unlawful reason.

52.    Although he was aware of Plaintiff Rhodes' status as a classified employee, Defendant Baker, with malice and a specific intent to harm, terminated Plaintiff Rhodes' employment. In so doing, Defendant Baker violated City of Atlanta ordinances and the due process rights of Plaintiff.

53.    Plaintiff attempted to file an appeal to the City of Atlanta Civil Service Board, but the Board refused to accept his appeal.

54.    Counsel for the City of Atlanta intervened to ensure that Plaintiff would not be terminated or suffer a loss in pay and affirmatively represented that Plaintiff was not demoted for cause.

55.    Following the intervention of counsel for the City of Atlanta, on September 8, 2016, Defendant Baker met with and personally demoted Plaintiff Rhodes to the position of Fire Captain, in retaliation for Plaintiff writing and allowing the Article to be published.   Defendant Baker, at that time, denied that the demotion was "for cause" and advised Plaintiff that he was bringing Plaintiff back "against his will." Defendant Baker made it clear to Plaintiff that he was reinstating Plaintiff and reversing his termination because he was forced to do so

by the City of Atlanta Law Department. At that time, Plaintiff Rhodes was not subject to a reduction in pay. During this meeting, Defendant Baker told Plaintiff, "Your articles are close to the line, but the T-shirt article was over the line." Plaintiff did not receive any formal documentation of his demotion to Captain.

56. On October 14, 2016, however, Defendant Baker, in retaliation for Plaintiff Rhodes writing and allowing the Article to be published, reduced Plaintiff's compensation from the level of a Battalion Chief to that of a Fire Captain, resulting in a significant loss of present and future income to Plaintiff Rhodes. Not only was Plaintiff's salary reduced to that of a Fire Captain, his pay was reduced to the lowest pay grade for a Fire Captain.

57. Said action will also affect the retirement income of Plaintiff Rhodes.

58. Said reduction in pay was made retroactive to October 06, 2016.

59. Said demotion was classified as an "involuntary demotion" pursuant to City of Atlanta Ordinance Section 114-362(a).

60. Pursuant to City of Atlanta Ordinance Section 114-362(a), an involuntary demotion may only be done "for just cause."

19

61.    On October 14, 2017, Defendant Baker, for the first time, claimed that the demotion and reduction in pay was "for cause." This claim is a mere pretext for unconstitutional retaliation.

62.    The October 14, 2016 involuntary demotion and loss of pay was effectuated by Defendant Baker and ratified by Department of Human Resources Commissioner for Defendant City of Atlanta, Yvonne Yancy.

63.    A memo to Plaintiff Rhodes reportedly dated October 14, 2016 outlining his Involuntary Demotion and reduction in pay was not postmarked until October 28, 2016.

64.    Plaintiff Rhodes did not receive said memo until November 1st or 2nd, 2016.

65.    Plaintiff Rhodes first learned of a reduction in his pay when he received his paycheck on October 28, 2016.

66.    Plaintiff Rhodes immediately filed a payroll discrepancy on Friday October 28, 2016 pursuant to and in accordance with City of Atlanta and City of Atlanta Georgia Fire Rescue Department Policy. He never received a response.

67.    Plaintiff Rhodes followed up on the reduction in pay with Deputy Fire Chief Chad Jones.

68.     Deputy Chief Chad Jones encouraged Plaintiff to file the payroll discrepancy and that either Deputy Fire Chief Chad Jones or his designee would respond the following Monday, October 31, 2016.

69.     When Plaintiff advised Deputy Fire Chief Jones that on September 8, 2016 Defendant Baker advised the demotion was in fact not for cause and that the chief was exercising "chief's discretion", Jones told Plaintiff that Defendant Baker specifically advised Jones that Plaintiff's demotion was "for disciplinary purposes." However, Jones could not provide Plaintiff with any alleged violation of a policy, rule, or city ordinance.

70.     Deputy Chief Chad Jones informed Plaintiff Rhodes that the City of Atlanta Human Resources Department was informed by Defendant Baker or his staff at Baker's direction that Plaintiff was demoted for disciplinary reasons and his pay was reduced accordingly. Plaintiff was never notified of any discipline, was never given a notice of charges or violations, and was denied the due process rights afforded to him as a City of Atlanta employee.

71.     The Article was a substantial motivating factor in the termination, demotion, and pay reduction of Plaintiff. Defendant Baker openly voiced his

displeasure about the Article as the final policy maker for the City of Atlanta, Georgia.

72.     There were no alternate grounds for Plaintiff's demotion and reduction in pay. Plaintiff's direct supervisor, Assistant Fire Chief Woodworth, had no cause to discipline Plaintiff and already provided Plaintiff a "highly effective" annual evaluation rating on June 16, 2016 for the period relevant to this Complaint. This rating and evaluation was entered six weeks prior to Plaintiff's termination. In fact, when Assistant Fire Chief Woodworth was off work, he frequently assigned Plaintiff to perform Woodworth's duties and placed him in charge of fire operations for the entire City of Atlanta.

73.     Plaintiff Rhodes's annual evaluations as Battalion Chief never included a single substandard rating or a recommendation for an area of improvement. As of the filing of this Complaint, Plaintiff has never received notice of a policy, rule, or ordinance violation in connection with his termination, demotion, and reduction in pay.

74.     Plaintiff Rhodes, as a City of Atlanta and protected Civil Service employee, was entitled to notice of any disciplinary action or adverse employment action as well as hearings to provide due process. However, Plaintiff was provided

neither notice nor a pre- or post-termination or a pre- or post-demotion opportunity for a hearing.

75.   Plaintiff Rhodes, as a City of Atlanta and protected Civil Service employee was entitled to notice of any disciplinary action or adverse employment action as well as hearings to provide due process. However, Plaintiff was not provided notice nor a pre- or post-reduction in pay opportunity for a hearing.

76.   The time to file an appeal had expired before Plaintiff Rhodes received the notice of the Involuntary Demotion and reduction in pay due to the failure of Defendant Baker to ensure Plaintiff received the letter in a timely manner.

77.   Defendant Baker intentionally delayed providing the notice of the Involuntary Demotion and reduction in pay with the specific intent to deny Plaintiff Rhodes of the opportunity to appeal his decision. Such act evidences malice and a specific intent to harm Plaintiff Rhodes.

78.   Plaintiff Rhodes attempted to pursue his rights through the payroll discrepancy process in place at the City of Atlanta and through the City of Atlanta Civil Service Board without success. The City of Atlanta Civil Service Board refused to allow Plaintiff to file for an appeal without a notice of final adverse

action which must be provided to any City of Atlanta employee who is terminated, suspended, demoted, subject to discipline beyond a verbal counseling, or subjected to a reduction in pay for cause.

79.   Defendant Baker is the final policy maker for Defendant City of Atlanta, Georgia Fire Rescue Department as demonstrated by his setting of policy, authority to hire, fire, and discipline employees, approval of department policies, development and dissemination of directives and memoranda which bind the actions of employees, and his control over the budget of the department.

80.   The City of Atlanta Fire Rescue Disciplinary Procedures Manual section 3.1 lists the role of the Fire Chief as follows:

3.1 THE FIRE CHIEF

The fire chief is responsible for the effective and professional administration of the disciplinary process. Therefore, the chief retains the authority to review, revoke, or modify any disciplinary actions taken by any supervisor in the department.

81.   The protection afforded statements of public concern and satirical or humorous speech is clearly established in the law and specifically in this judicial circuit.

82.     Because the protection afforded statements of public concern and satirical or humorous speech is clearly established in the law and specifically in this judicial circuit, Defendants are not entitled to qualified or official immunity.

83.     Defendant Baker violated City of Atlanta policy by retaliating against Plaintiff due to his drafting and publishing of the Article.

84.     Defendants City of Atlanta, and City of Atlanta Fire Rescue failed to prevent Defendant Baker from unlawfully terminating and demoting Plaintiff and reducing his pay thereby ratifying Defendant Baker's unlawful and improper acts.

85.     Defendant City of Atlanta Fire Rescue is a division of the City of Atlanta, Georgia that sets policy and directs and approves policy regarding the provision of fire and emergency medical services within the city limits of Atlanta, Georgia.

86.     In October 2016, Defendant Baker formally documented in Plaintiff's personnel file that his demotion was for cause and reduced his pay. However, Defendant Baker has never cited a policy, rule, or ordinance violation to justify his actions, nor has he served Plaintiff with any formal notice of a policy, rule, or ordinance violation as required by City of Atlanta policies, rules, and ordinances.

87.   A demotion for cause must be effectuated according to an established policy intended to provide due process to the affected employee.

88.   City of Atlanta Ordinance Section Sec. 114-362. – "Demotions" provides that an employee may only be demoted for cause and the employee must be notified prior to such demotion in writing prior to such action. Plaintiff was not provided timely notice of the October 2016 demotion.

89.   Plaintiff was entitled, pursuant to the policies of Defendants City of Atlanta and the City of Atlanta Fire Rescue with timely notice of the change in status of his demotion for cause and a reduction in his pay.

90.   Defendant Baker, showing malice and a specific intent to harm failed to notify Plaintiff of the change in the reason for his demotion. Plaintiff learned of this fact from a third party through the payroll system causing Plaintiff to originally believe the reduction in pay was a payroll error.

91.   Defendant Baker, showing specific intent to harm and malice, changed the reason for Plaintiff's demotion in an underhanded, and secretive manner with the goal of depriving Plaintiff of the due process rights afforded to him pursuant to policy. Defendant Baker's specific intent to harm, malice, and motivation is evidenced by his statement to Plaintiff on September 8, 2016 to wit:

26

"Your articles are close to the line, but the T-shirt article was over the line."
Defendant Baker also sought to intimidate Plaintiff and others to prevent them from exercising their First Amendment rights under the United States Constitution.

## COUNT I: 42 U.S.C. § 1983 DENIAL OF PROCEDURAL DUE PROCESS

92.  Plaintiff Rhodes hereby reincorporates and realleges all claims in this Complaint as if fully set forth herein.

93.  Plaintiff Rhodes, as an employee of the City of Atlanta, was deprived of his right to procedural due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution because he was terminated, demoted, and his pay reduced without notice or a pre-deprivation hearing. Said notice and hearing is required by the policies in place for City of Atlanta employees as well as employees assigned to the Defendant City of Atlanta Fire Rescue Department.

94.  At all times, Defendants acted under the color of law to deprive Plaintiff Rhodes of his constitutional due process rights and Plaintiff has suffered substantial harm. The constitutional violation is continuing and will continue until Plaintiff is reinstated to his prior position and level of pay as Battalion Chief.

95.     Defendant City of Atlanta, Georgia is liable for the unconstitutional actions of Defendant Baker in his role as a final policy maker. Defendant City of Atlanta, Georgia is also liable based upon a failure to train Defendant Baker and other employees as well as failing to ensure that the constitutional and due process rights of employees are protected. Defendant City of Atlanta was on notice that Defendant Baker required training because a city attorney was forced to intervene in the personnel actions Defendant Baker took against Plaintiff and other employees and a city attorney forced Defendant Baker to reverse Plaintiff's termination. Defendant City of Atlanta was on notice that personnel in Human Resources required additional training because they failed to question Defendant Baker's unlawful and improper termination of Plaintiff.

## COUNT II: 42 U.S.C. § 1983 FIRST AMENDMENT RETALIATION

96.     Plaintiff Rhodes hereby reincorporates and realleges all claims in this Complaint as if fully set forth herein.

97.     The demotion and reduction in pay suffered by Plaintiff Rhodes was carried out by Defendants under the color of law and in retaliation for Plaintiff speaking publicly on a matter of great public interest and concern.   The retaliatory

demotion and reduction in pay deprived Plaintiff Rhodes of his rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

98.    Plaintiff Rhodes has suffered substantial harm as a result of the violation of his constitutional rights.  The constitutional violation is continuing and will continue until Plaintiff is reinstated to his prior position and level of pay as Battalion Chief.

99.    Defendant City of Atlanta, Georgia is liable for the unconstitutional actions of Defendant Baker in his role as a final policy maker. Defendant City of Atlanta, Georgia is also liable based upon a failure to train Defendant Baker and other employees as well as failing to ensure that the constitutional and due process rights of employees are protected.

100.  Defendant City of Atlanta was on notice that Defendant Baker required training because a city attorney was forced to intervene in the personnel actions Defendant Baker took against Plaintiff and other employees and a city attorney forced Defendant Baker to reverse Plaintiff's termination. Defendant City of Atlanta was on notice that personnel in Human Resources required additional training because they failed to question Defendant Baker's unlawful and improper termination of Plaintiff.

## COUNT IV:  VIOLATION OF THE RIGHT OF

## FREE SPEECH UNDER THE GEORGIA CONSTITUTION

101.   Plaintiff Rhodes hereby reincorporates and realleges all claims in this Complaint as if fully set forth herein.

102.   The demotion and reduction in pay suffered by Plaintiff Rhodes was carried out by Defendants under the color of law and in retaliation for Plaintiff speaking publicly on a matter of great public interest and concern.   The retaliatory demotion and reduction in pay deprived Plaintiff Rhodes of his rights guaranteed by Article I, Section I Paragraph V of the Georgia Constitution.

103.   Plaintiff Rhodes has suffered substantial harm as a result of the violation of his constitutional rights.  The constitutional violation is continuing and will continue until Plaintiff is reinstated to his prior position and level of pay as a Battalion Chief.

## COUNT V:  CONVERSION

104.   Plaintiff Rhodes hereby reincorporates and realleges all claims in this Complaint as if fully set forth herein.

105.   Plaintiff Rhodes was unlawfully demoted from Battalion Chief to the rank of Captain.

106.  Plaintiff Rhodes' salary was unlawfully reduced.

107.  Plaintiff Rhodes is entitled to the immediate possession of the difference in salary between that of a Battalion Chief with his tenure and experience and his current salary as a Captain.

108.  Defendants have actual possession of Plaintiff Rhodes' property to wit: the difference in salary between that of a Battalion Chief and a Captain in the general funds and other accounts in which the City of Atlanta maintains payroll funds.

109.  Defendants have refused to return the money described herein owed to Plaintiff Rhodes.

110.  The money owed to Plaintiff Rhodes is an ascertainable amount at this time and increasing in a predictable and definable amount with time as Plaintiff Rhodes is not being paid his correct salary.

## COUNT VI:      TRESPASS TO PERSONALTY

111.  Plaintiff Rhodes hereby reincorporates and realleges all claims in this Complaint as if fully set forth herein.

112.  Plaintiff Rhodes was unlawfully demoted from Battalion Chief to the rank of Captain.

113.   Plaintiff Rhodes' salary was unlawfully reduced.

114.   Plaintiff Rhodes' salary is personalty under Georgia law.

115.   Defendants' taking and refusal to return the salary owed to Plaintiff Rhodes constitutes a trespass on the personalty of Plaintiff Rhodes.

116.   This trespass is a continuing tort every day that Defendants refuse to return Plaintiff Rhodes' personalty.

117.   In compliance with Georgia law, Plaintiff presented an ante litem notice and demand to the City of Atlanta pursuant to O.C.G.A. §36-33-5 on March 8, 2017. The City of Atlanta failed to respond to said demand. Such failure to respond or engage in discussion with Plaintiff constitutes stubborn litigiousness, bad faith, and evidences an intent to cause the Plaintiff unnecessary trouble and expense.

## COUNT VII:      MONEY HAD AND RECEIVED

118.   Plaintiff Rhodes hereby reincorporates and realleges all claims in this Complaint as if fully set forth herein.

119.   Defendant City of Atlanta has received money justly belonging to the plaintiff;

120.  Plaintiff made a demand for repayment of said funds through his ante litem notice and demand dated March 8, 2017.

121.  Defendant City of Atlanta failed to respond to said demand for payment and failed to return the funds unjustly being held by said Defendant.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rhodes respectfully requests the Court to find in his favor and award him:

A.    Compensatory damages, including lost wages, front pay, back pay, lost or reduced benefits, harm to reputation, lost and diminished promotional opportunities, interest, and any other harm suffered by Plaintiff in amounts to be shown at trial;

B.    Punitive damages against Defendant Baker in an amount to be shown at trial;

C.    Costs incurred and reasonable attorneys' fees to be awarded pursuant to 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11 and;

D.      Reinstatement of Plaintiff Rhodes to his prior position of Battalion Chief and restoration of his prior level of compensation as Battalion Chief, with an award of all lost back pay, eligibility for promotions, retirement contributions, and benefits;

E.      Such additional relief as the Court deems just and proper.

Respectfully submitted this 18th day of September, 2017.

LoRusso Law Firm, P.C.

Lance J. LoRusso
Georgia Bar No. 458023
Justin H. Meeks
Georgia Bar No. 617181

1827 Powers Ferry Road, S.E.
Building 8, Suite 200
Atlanta, Georgia 30339
(770) 644-2378
(770) 644-2379 (f)
lance@lorussolawfirm.com
justin@lorussolawfirm.com

THIS DOCUMENT APPEARS IN TIMES NEW ROMAN 14 POINT FONT